IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 13–cv–00748–KMT

SHANNON PEACE,

Plaintiff,

v.

PARASCRIPT MANAGEMENT, INC., a Wyoming Corporation, and
DOES 1 THROUGH 10, inclusive,

Defendants.

---

**ORDER**

---

This matter is before the court on “Defendants’ Motion for Summary Judgment.” (Doc. No. 52, filed Feb. 24, 2014 [Mot.].) “Plaintiff Shannon Peace’s Response to Defendants’ Motion for Summary Judgment” was filed on March 20, 2014 (Doc. No. 53 [Resp.]) and Plaintiff’s Reply was filed on April 7, 2014 (Doc. No. 54 [Reply]). For the following reasons, Defendants’ Motion for Summary Judgment is GRANTED.

## FACTUAL BACKGROUND

In his Amended Complaint, filed October 20, 2013, Plaintiff alleges that Defendants agreed to provide him with a guaranteed salary of $250,000 for three years in exchanged for his management of hedge funds known as the Horus Fund and the Horus Fund II (the "Funds"). Plaintiff alleges the Defendants breached that agreement by withdrawing from Horus Capital Management LLC ("HCM"), the limited liability company responsible for the Funds, and paying Plaintiff only $375,000 out of the total $750,000 allegedly guaranteed to him. (*See generally* Am. Compl., Doc. No. 39.)

Defendant Parascript LLC ("Parascript") develops, owns, and sells pattern recognition software, including stock selection software and software that reads handwriting and machine print. (*See* Mot., Ex. A; Resp., Ex. 1, Deposition of William Pearlman [Pearlman Dep.], at 27:11-24.)[1] Defendant Parascript Management, Inc. ("PMI") is the managing member of Parascript.[2] (*Id.* at 39:19-40:10.)

---

[1] Defendants and Plaintiff have both attached extensive, but differing, excerpts from the depositions of Mr. Pearlman, Plaintiff, and other witnesses. (*Compare, e.g.*, Mot., Ex. A-B *with* Resp. Ex. 1-2.) Although the court will initially cite to the exhibit number of the relevant deposition, for sake of ease, the court will thereafter cite to the relevant pages of that deposition, without endeavoring to specify which parties' exhibit includes the page(s) cited.

[2] Defendants assert that "PMI is essentially a payroll and benefits services company, which administers the payroll for Parascript and which used to administer payroll for HCM." (Mot. at 3, ¶2 (citing Pearlman Dep. at 41:16-20; 43:20-44:3; 179:4-15.) Plaintiff disagrees with this characterization and argues that the fact that PMI issued Plaintiff's checks and W-2 forms, and provided Plaintiff with health and vision, insurance, and retirement benefits is evidence that Plaintiff was an employee of PMI (Resp. at 3 ¶ 2 (citing Pearlman Dep. at 159:15-23; 178:6-179:3:188:1-189:15.) However, even if PMI was Plaintiff's employer, as Plaintiff suggests, this

In the summer of 2010, Parascript's board of directors decided to open a hedge fund to make investments based on the investment model chosen by its stock selection software. (*Id.* at 52:16-53:11.) However, because none of the members of Parascript's board of directors had any experience in establishing a hedge fund, Parascript's CEO, William Pearlman, contacted certain individuals who were considered knowledgeable about the hedge fund industry and who knew how to start a hedge fund. (*Id.* at 57:18-22.) One of those individuals put Mr. Pearlman in touch with Plaintiff. (*Id.* at 58:24-60:9.)

At the time, Plaintiff was managing his own hedge fund, the Alluviant Group, which had approximately $5 million in capital investments and a both solid and growing group of clients. (Mot., Ex. B; Resp., Ex. 2, Deposition of Shannon Peace [Peace Dep.], at 62:4-25.) One of the reasons Mr. Pearlman sought to move forward with Plaintiff in creating the hedge fund was that Plaintiff might be able to bring existing investors and capital from the Alluviant Group over to the new hedge fund. (Pearlman Dep. at 104:3-11.) Plaintiff shut down the Alluviant Group in December 2010, presumably at or around the time the Operating Agreement discussed *infra* was executed. (*See* Peace Dep. at 62:14-20; 64:21-24.)

In September 2010, Plaintiff flew to Colorado to meet with Mr. Pearlman, Alexander Filatov, the future President and Chief Technical Officer of HCM, and Aron Katz, the Chairman of the Board of the Managing Member of HCM. (*Id*. at 101:21-103:1.) As discussed in that

---

fact is not material to his claims. Instead, because his claims are for breach of contract and promissory estoppel, the pertinent issue is only whether PMI entered an enforceable contract with, or made enforceable promise to, Plaintiff.

meeting, Plaintiff's potential role in the new venture would be to "bring on the new investors as well as new and current existing investors in order to capitalize the fund and then manage the accounts or the account with the assistance of Alexander's [Filatov] stock selection process." (*Id.* at 102:19-103:1.) At some point either during or prior to this meeting, Plaintiff alleges he made it clear that he required a guaranteed salary of $250,000 for three years to make the move. (*Id.* at 122:12-124:17.)

On September 16, 2010, Plaintiff sent Mr. Pearlman an email inquiring as to how his $250,000 salary would be set up for accounting purposes. (Resp., Ex. C at PEACE001248.) Mr. Pearlman responded, "We have not finally decided the structure. You probably can get paid as an employee and get benefits or you can get paid as a 'guaranteed payment to a shareholder.'" (*Id.*) Plaintiff agreed that the discussion regarding his salary was "premature until we see how the deal will be structured." (*Id.* at PEACE 001249.)

That same day, September 16, 2010, Mr. Pearlman sent Plaintiff, Mr. Filatov, and Mr. Katz a "Deal Points" memorandum summarizing the discussions of their in-person meetings. (Mot., Ex. C.) The Deal Point memorandum explicitly provided that it was "for discussion purposes only and is not binding upon any of the parties until incorporated into a letter of intent signed by all the parties." (*Id.*) The Deal Point memorandum stated that Plaintiff was to "receive a salary of $250,000, which is guaranteed for three years," subject to certain restrictions. (*Id.* at PMI/Peace 000048.)

On some unspecified date, Mr. Katz prepared a memorandum regarding the "proposed deal" to create the hedge fund. (Resp., Ex. 4.) That memorandum provided that Plaintiff would "oversee the Fund." (*Id.* at PEACE00079.) It also provided that the Fund would charge investors a two percent management fee, and that the principals of the funds would be entitled to 20 percent participation in the profits in the fund. (*Id.*) These fees would be used by a yet-to-be formed management entity to pay expenses, including Plaintiff's salary. (*Id.* at PEACE00080.) Finally, the memorandum provided that Plaintiff would be hired as President with a guaranteed salary of $250,000 for three years, subject to certain conditions. (*Id.*)

On October 29, 2010, HCM was formed by filing Articles of Incorporation with the Secretary of State of Colorado. (*See* Mot., Ex. E at 1.) On December 29, 2010, Plaintiff signed, as a member of HCM, the "Second Amended and Restated Operating Agreement of Horus Capital Management, LLC" (hereinafter "Operating Agreement"). (*Id.*) The Operating Agreement was also signed by all of the other members of HCM, namely Parascript, Mr. Katz, Mr. Pearlman, Mr. Filatov, Stephan Pachikov, Timofei Strunkov, Yelena Misureva, and four of Plaintiff's clients. (*See id.*)

Generally, the Operating Agreement finalized the structure of HCM. (*See generally id.*) Although not entirely clear from the record, the Operating Agreement also may have established the Funds. (*See id.*, Ex. F.)

With respect to Plaintiff's compensation, Section 5.1.3 of the Operating Agreement provides that Plaintiff, in his capacity as the Chief Investment Officer of HCM, would be paid a

"Services Payment" equivalent to $250,000 per year for three years, subject to an annual adjustment based on the performance of the Funds. (*Id.* at 8.) Under Section 5.1.1, Plaintiff's Services Payment would be paid from HCM's cash receipts. (*Id.* at 8.)

Section 5.1.3 also states that the Services Payment is subject to the provisions of Section 3.6 of the Operating Agreement. (*Id.*) Section 3.6, in turn, allows HCM's members to voluntarily terminate their membership in HCM upon providing written notice to HCM and all other members. (*Id.* at 4.) Section 11.9 of the Operating Agreement provides that a member who withdraws will be relieved of any rights or obligations under the Operating Agreement. (*Id.* at 21.)

Section 5.8 of the Operating Agreement provides that Parascript was to fund HCM in the event of any Services Payment shortfalls. (*Id.* at 10.) In particular, Parascript agreed that, "for so long as it is a Member of the [HCM]," it would loan to HCM "such amounts as may be necessary to cover Payment Shortfalls," in consideration for a promissory note issued by [HCM]." (*Id.* at 10.)

Finally, the Operating Agreement contains a integration clause as follows:

> Entire Agreement: This Agreement is intended by the parties as a final expression of their agreement concerning the Company. No course of prior dealings among the parties shall be relevant or admissible to supplement, explain or vary any of the terms of this Agreement. No representations, undertakings or agreements have been made or relied upon in the execution of this Agreement other than those specifically set forth in this Agreement. This Agreement contains the entire agreement among the parties with respect to the subject matter of this Agreement.

(Operating Agmt. at 22.)

In HCM's first eighteenth months of operation, the Funds sustained substantial losses. (Resp., Ex. 11.) On August 20, 2012, Parascript gave written notice of its withdrawal from HCM to the other members of HCM, pursuant to Section 3.6 of the Operating Agreement. (Mot., Ex. F.) Parascript's withdrawal, combined with a decision to suspend the management fees imposed on investors, effectively shut down the Funds and negated any source of financing to pay Plaintiff's Services Payments. On September 12, 2012, Plaintiff approved an email to investors stating that he could not continue in his position managing the Funds without compensation. (Mot., Ex. I.)

**PROCEDURAL HISTORY**

Plaintiff's original Complaint, which named only PMI as a Defendant, was filed on October 11, 2012 in California state court. (*See* Doc. No. 3 at 11-19.) Defendants removed the case to the United States District Court for the Central District of California on November 9, 2012. (*Id.* at 1-6.) On March 18, 2013, the Central District of California granted PMI's Motion to Transfer Venue and the case was transferred to this court on March 21, 2013. (*See* Doc. No. 1.)

On July 19, 2013, Plaintiff filed a Motion for Leave to File Amended Complaint to add Parascript as a Defendant and assert a promissory estoppel claim. (Doc. No. 28.) The court granted this motion, over PMI's objection, on October 18, 2013, and Plaintiff's Amended Complaint was filed that same day. (*See* Order, Doc. No. 34; Am. Compl.) In his Amended Complaint, Plaintiff asserts claims against both PMI and Parascript for (1) breach of contract, (2)

breach of the covenant of good faith and fair dealing, and (3) promissory estoppel. (*See* Am. Compl.).

**LEGAL STANDARD**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The

factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty*., 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

**ANALYSIS**

***A. Claim One - Breach of Contract***

Plaintiff's breach of contract claim alleges that Defendants agreed to pay him a $250,000 yearly salary that was guaranteed for three years, and breached that promise by failing to pay him the remaining $375,000 of the full three year value of $750,000 guaranteed to him after Parascript withdrew from HCM. (*See* Am. Compl. ¶¶ 13-14, 28, 32, 36-42.) To recover on a breach of contract claim, a plaintiff must prove the following elements: (1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992). Generally, "it is for the jury to determine whether the parties have entered into a contract." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986). However, the more precise statement of this proposition is

"when the existence of a contract is in issue," meaning that the "evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." *Id.*

Plaintiff concedes his breach of contract claim is not premised on the Operating Agreement—likely because the Operating Agreement provides that Plaintiff's Services Payment was to be paid from HCM's cash receipts, rather than by Defendants. (Resp. at 9.) Instead, Plaintiff contends that, separate from and in addition to the Operating Agreement, he and Defendants reached an oral contract in which Defendants agreed to pay him a $250,000 salary that was guaranteed for three years. (Resp. at 9-10.)

Defendants argue, *inter alia*, that any purported oral agreement to pay Plaintiff a guaranteed three-year salary is unenforceable under Colorado's Statute of Frauds. (Mot. at 13.) The court agrees.

Colorado's Statute of Frauds provides that "[e]very agreement that by the terms is not to be performed within one year after the making thereof . . . shall be void, unless such agreement or some note or memorandum thereof is in writing and subscribed by the party charged therewith." Colo. Rev. Stat. § 38-10-112(1)(a). Here, Defendants' purported oral agreement to pay a Plaintiff a three-year guaranteed salary of $250,000 is subject to the Statute of Frauds. Indeed, by its terms a contract guaranteeing a specified yearly salary to an individual which was to extend for each of three separate years cannot have been fully performed within a year. *Whatley v. Crawford & Co.*, 15 F App'x 625, 635 (10th Cir. 2001).

Plaintiff argues that the oral contract he reached with Defendants is not void under the Statute of Frauds because there is a written note or memorandum reflecting the agreement. More specifically, Plaintiff asserts that the oral contract was memorialized in (1) the emails he exchanged with Mr. Pearlman on September 16, 2010 (Resp., Ex. 3); (2) the Deal Point memorandum sent by Mr. Pearlman the same day (Mot., Ex. C); and (3) and the memorandum Mr. Katz prepared regarding the "proposed deal" (Resp., Ex. 4.) The court disagrees.

The memorandum or note necessary to bring an oral contract outside of the Statute of Frauds must show on its face or by reference to other writings (1) the names of the parties, (2) the terms or conditions of the contract, (3) the interest or property affected, and (4) the consideration to be paid therefor. *L.U. Cattle Co. v. Wilson,* 714 P.2d 1344 (Colo. App. 1986). "Moreover, to constitute a sufficient writing to take [an] oral contract outside the statute of frauds, the writing must be 'in confirmation of the contract.'" *Nations Enters., Inc. v. Process Equip. Co.,* 579 P.2d 655, 658 (Colo. App. 1978).

Here, the September 16, 2010 email, the Deal Point memorandum, and Mr. Katz's memorandum do not include the essential terms of the contract and also fail to state that either Parascript or PMI were parties to an agreement to pay Plaintiff a guaranteed yearly salary of $250,000 for each of three separate years. First, Mr. Katz's memorandum does not state that Defendants herein were parties to an agreement to provide Plaintiff with a guaranteed yearly salary of $250,000 for three separate years; instead, it specifically states that a yet-to-be formed management entity (i.e., HCM) would pay this salary to Plaintiff. (Resp., Ex. 4 at

PEACE000080.) Similarly, the Deal Points memorandum states that Plaintiff's proposed salary is "to be a credit against his share of carry proceeds" held by a yet-to-be-formed "Carry" entity. (Mot., Ex. C at PMI/Peace 000048.) Finally, Mr. Pearlman's September 16, 2010 email exchange with Plaintiff does not refer to any of the parties or terms of the purported oral contract; instead, it merely discusses whether it would be better for Plaintiff's salary to be distributed to him as an employee or as a shareholder for accounting and tax purposes. (Resp., Ex. 3 at PEACE001248.)

More importantly, the court finds it cannot be genuinely disputed that these writings did not "confirm" the purported oral contract to pay Plaintiff a guaranteed yearly salary for each of three separate years—instead they clearly constituted negotiations with respect to a future transaction. First, Mr. Pearlman's September 16, 2010 email states that "we have not finally decided the structure" of Plaintiff's salary, but that Plaintiff "*probably* can get paid as an employee" of one of the yet-to-be-formed entities. (*Id.*) (emphasis added). Further, Plaintiff agreed that the salary discussions were "*premature* until we see how the *deal* will be structured." (*Id.* at PEACE001249) (emphasis added).

Similarly, the Deal Points memorandum explicitly states that "this information is for discussion purposes only and is not binding upon any of the parties until incorporated into a letter of intent signed by all the parties." (Mot., Ex. C at PMI/Peace 000048.) Finally, Mr. Katz's memorandum clearly states that he referring to a "proposed deal" when discussing the terms of Plaintiff's salary. (Resp., Ex. 4 at PEACE000079-80.) As such, the court finds that no

reasonable jury could conclude that these documents confirm that a final contract had been reached; instead, on their face, they demonstrate "that something more must be done before a contract could come into existence." *Nations Enters.*, 579 P.2d at 658.

Altogether, even viewing the evidence in a light most favorable to him, Plaintiff has failed to set forth a memorandum or note that confirms the purported oral contract between Defendants and Plaintiff, so as to bring it outside the Statute of Frauds. As such, Defendants' purported oral agreement to pay Plaintiff a guaranteed yearly salary of $250,000 for three years is void under the Statute of Frauds.[3] Further, Plaintiff has failed to establish the existence of any other contract, as opposed to documents reflecting negotiations, whereby Defendants agreed to pay him a guaranteed yearly salary of $250,000 for three years. The court therefore finds that Defendants are entitled to summary judgment on Plaintiff's first claim for breach of contract.

---

[3] Even if Defendants' purported oral agreement to pay Plaintiff a guaranteed yearly salary for three separate years were otherwise valid, it would be unenforceable as it conflicts with the Operating Agreement. As discussed, above, the Operating Agreement contains an integration clause. (Operating Agmt. at 22.) To be sure, a prior oral agreement may not be superseded or invalidated by an integrated written contract relating to the same subject matter, if the prior oral agreement "is not inconsistent with the integrated contract, and (a) is made for separate consideration, or (b) is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to written contract." *Stevens v. Vail Assocs., Inc.*, 472 P.2d 729, 731 (quoting Restatement (First) of Contracts (1932)). However, here, Defendants purported oral agreement to pay Plaintiff a guaranteed yearly salary of $250,000 for three separate years directly conflicts with Section 5.1 of the Operating Agreement, which provides that the same salary, or Services Payment, would be paid from HCM's cash receipts, if any. (Operating Agmt. at 8.)

***B. Claim Two – Breach of Covenant of Good Faith and Fair Dealing***

Under Colorado law, "[e]very contract contains an implied duty of good faith and fair dealing." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo. App. 1994). However, a necessary predicate for a claim for breach of the covenant of good faith and fair dealing is the existence of a contract, "as the claim generally 'must be tied to a specific contract term that allows for discretion on the part of either party.'" *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 624 (10th Cir. 1995) (citing *Ervin v. Amoco Oil Co.*, 885 P.2d 1994 *rev'd in part on other grounds by* 908 P.2d 493 (Colo. 1995)).

As with his breach of contract claim, Plaintiff premises his good faith and fair dealing claim exclusively on the Defendants' purported oral agreement to pay Plaintiff a guaranteed yearly salary of $250,000for each of three separate years.[4] (Resp. at 19.) As discussed above, however, any purported oral agreement between Plaintiffs and Defendants with respect to Plaintiff's salary is void under the Statute of Frauds. As such, because Plaintiff has failed to demonstrate the existence of a contract as a predicate for proving a claim for breach of the covenant of good faith and fair dealing, the court finds that Defendants are entitled to summary judgment on Plaintiff's second claim for relief.

---

[4]Indeed, Plaintiff has disavowed that this claim is premised on the Operating Agreement. (*See* Resp. at 19-20; *see also* Am. Compl. ¶¶ 43-48.)

***C. Claim Three – Promissory Estoppel***

To recover on a promissory estoppel theory, a party must establish that (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that promise would induce action or forebearance by the promise; (3) the promisee in fact reasonably relied on the promise to the his detriment; and (4) the promise must be enforced to prevent injustice. *D & R's Aspen Ret. Plan, LLC v. DeGraff*, No. 09-cv-01963-LTB-CBS, 2010 WL 4024013, at *6 (D. Colo. Oct. 12, 2010); *see also Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995). The promise must be "clear and unambiguous." *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994). It also must be sufficiently definite to allow a court to understand the nature of the obligation. *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 620 (Colo. App. 1997).

Plaintiff's promissory estoppel claim alleges that Defendants made promises and commitments to him to (1) provide him with guaranteed compensation of $250,000 per year for three years and (2) to provide ongoing long-term financial support to the Funds. (Am. Compl. ¶ 50.) Plaintiff further alleges that he reasonably relied on those promises to his detriment by closing the Alluviant Group and bringing his client accounts and established business relationships over to HCM and the Funds. (*Id.* ¶ 52.)

Defendants argue that they are entitled to summary judgment on this claim based on the existence of the Operating Agreement. The court agrees.

Promissory estoppel is "applicable only in the absence of an otherwise enforceable contract." *Scott Co of Cal. v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1992)

*overruled on other grounds by Lewis v. Lewis,* 189 P.3d 1134, 1140 (Colo. 2008). "The alternative remedy of promissory estoppel is never reached when there has been mutual agreement by the parties on all essential terms of a contract." *Id.* (citing *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900 (Colo. 1982)). A claim for promissory estoppel is barred even as to a non-signatory to an enforceable contact where there is a close relationship between the non-signatory and one-of the signatories. *DeFranco v. Storage Tech. Corp.*, 622 F.3d 1296, 1304 (10th Cir. 2010); *see also D & R's Aspen Ret. Plan,* 2010 WL 4024013, at *6 (granting summary judgment on a promissory estoppel claim where there was an actual enforceable agreement covering the same subject matter, even though one of the defendants was not a party to that agreement).

Here, the Operating Agreement is an enforceable contract that outlines essential terms with respect to Plaintiff's salary, or Services Payment, as well as how HCM and the Funds would be funded, including members' withdrawal rights and obligations. (*See* Operating Agmt at 8, 10.) The Operating Agreement was signed by both Plaintiff and Parascript as members of HCM. (*See id.*) As such, there is an enforceable contract between Plaintiff and Parascript regarding the very subject matter of Plaintiff's promissory estoppel claim.

Further, PMI is the managing partner of Parascipt. (Pearlman Dep. at 39:19-40:10.) This close relationship between PMI and Parascript also precludes Plaintiff's claim for promissory estoppel against PMI. *DeFranco v. Storage Tech. Corp.*, 622 F.3d 1296, 1304 (10th Cir. 2010);

*D & R's Aspen Ret. Plan, LLC v. DeGraff,* No. 09-cv-01963-LTB-CBS, 2010 WL 4024013, at *6 (Oct. 12, 2010).

Furthermore, even if Plaintiff could assert promissory estoppel claim against Parascript and PMI, the Operating Agreement would nevertheless foreclose the court from finding that Plaintiff reasonably relied on Defendants' purported promises to pay him a guaranteed salary and provide long-term funding for HCM and the Funds. "'If a written contract is completely integrated, it is unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made prior to its execution.'" *JBD Med., Inc. v. The Sorin Group S.P.A,* Case No. 07-cv-00350-REB-CBS, 2008 WL 10580039, at *7 (D. Colo. June 11, 2008) (quoting *Watkins v. Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir. 2001)) (granting summary judgment on a promissory estoppel claim based on the existence of an integrated contract). *See also Conagra Trade Group, Inc. v. Fuel Exploration, LLC,* 636 F. Supp. 2d 1166, 1175 (D. Colo. 2009).

Here, the Operating Agreement signed by Plaintiff contains an integration clause stating, *inter alia*, "[n]o representations, undertakings or agreements have been made or relied upon in the execution of this Agreement other than those specifically set forth in this Agreement." (Operating Agmt. at 22.) Thus, even if Plaintiff could assert a promissory estoppel claim against Parascript and PMI, his reliance on any promise Defendants made to pay him a guaranteed yearly salary of $250,000 for three separate years or to provide long-term funding to HCM and

the Funds was unreasonable as a matter of law since this is contrary to the explicit terms of the Operating Agreement.

Plaintiff cites to *Stevens*, 472 P.2d at 731 (discussed *supra* at note 4) and argues that Defendants' alleged promises to pay him a guaranteed yearly salary of $250,000 for three years are not invalidated because they are not inconsistent with the Operating Agreement. (Resp. at 24-25.) However, *Stevens* relates to whether a prior oral *contract* is superseded or, alternatively, enforceable, notwithstanding the existence of a subsequent integrated written contract. 472 P.2d at 731-732. The court is unable to locate any case applying the rule announced in *Stevens* to a promissory estoppel claim. Indeed, a promissory estoppel claim is fundamentally different from the claims addressed in *Stevens*. Under a theory of promissory estoppel, a promisee must demonstrate that it was reasonable for him to rely on what is otherwise an unenforceable agreement to his detriment. As a matter of law, it was not reasonable for Plaintiff to rely on Defendants' purported promises to pay him a guaranteed yearly salary for three years and to provide long-term financial support for the Funds where there was an integrated contract relating to the same subject matter. *JBD Med., Inc. v. The Sorin Group S.P.A*, 2008 WL 10580039, at *7 (quoting *Watkins & Sons Pet Supplies*, 254 F.3d at 612).

Moreover, even if the rule announced in *Stevens* did apply to a promissory estoppel claim, the court finds that the alleged promises Defendants made to Plaintiff are inconsistent with the Operating Agreement. First, Defendants' alleged promise to pay Plaintiff a guaranteed

salary of $250,000 for three years is inconsistent with the Operating Agreement, which provides that Plaintiff's salary would be paid from HCM's cash receipts. (Operating Agmt. at 8.)

Second, Defendants' alleged promise to provide long-term financial support for the Fund is at odds with the terms of Sections 3.6, 5.8 and 11.9 of the Operating Agreement. More specifically, under Section 5.8, Parascript agreed to provide financing, in the form of promissory notes issued to HCM, in the event that HCM incurred a funding shortfall—***but only for so long as Parascript was a member of HCM***. (*Id.* at 11, emphasis added.) In turn, Sections 3.6 and 11.9 provide, respectively, that (1) a member of HCM is free to terminate its membership at any time upon notice to the other members and (2) that a withdrawing member is relieved of any rights or obligations under the Operating Agreement. (Operating Agmt. at 4, 21.) Thus, enforcing Defendants' purported promise to provide financing to HCM and the Funds after Parascript withdrew would be fundamentally inconsistent with the terms of the Operating Agreement.

Altogether, the court finds that Plaintiff's promissory estoppel claim fails as a matter of law. As a consequence, Defendants are entitled to summary judgment on Plaintiff's third claim for promissory estoppel.

Therefore, for the foregoing reasons, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 52) is **GRANTED**. Accordingly, this case is **DISMISSED WITH PREJUDICE** and the Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff. Pursuant to

D.C.COLO.LCivR 54.1, Defendant may thereafter have their costs by filing a bill of costs within 14 days of the date of this Order. It is further

**ORDERED** that the Final Pretrial/Trial Preparation Conference set for October 27, 2014 and the three-day Jury Trial set for November 17, 2014 are **VACATED**.

Dated this 9th day of September, 2014.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge